1

2

3

4

5

6

7

8

9
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
10
AT TACOMA

11

12
SHERI SWEENEY, QUI TAM PLAINTIFF,
for and on behalf of the United States of
13
America,                                                    Case No.  C03-5320RJB

14
            Plaintiff,
                                                            ORDER
15
    v.

16
MANORCARE HEALTH SERVICES, INC.,
a Delaware corporation; STACEY
17
MESAROS; "JOHN DOES(S)" 1 through 50;
and "JOHN DOE, INC.(S)" 1 through 5,
18
            Defendants.
19

20

21          This matter comes before the Court on Defendants' Motion for Partial Summary Judgment on

22   Federal Claims Act Retaliation Claim (Dkt. 116), Defendants' Motion for Partial Summary Judgment of

23   Dismissal of Plaintiff's Wrongful Termination in Violation of Pubic Policy Claim (Dkt. 117), Defendants'

24   Motion for Partial Summary Judgment of Dismissal of Plaintiff's Defamation/Slander Claim (Dkt. 111),

25   and Defendants' Motion to Strike Inadmissible Evidence and Argument Based thereon from Plaintiff's

26   Oppositions to Defendants' Motions for Summary Judgment (Dkt. 138).  The Court has reviewed all

27   documents filed in support of and in opposition to these motions, has reviewed the entire file, and is fully

28   advised.

1

# I.   BASIC and PROCEDURAL FACTS

2

### A.   PROCEDURAL FACTS

3

Sweeney filed a complaint in this matter on June 9, 2003 asserting claims under the False Claims

4

Act ("FCA").  Dkt. 1.  As is required under the FCA, Sweeney served the United States, which declined to

5

intervene.  The Court ordered ManorCare be served and the Complaint unsealed on March 8, 2004.  Dkt.

6

8.  ManorCare was served on July 8, 2004.  Dkt. 15, at 2.

7

ManorCare filed a Motion to Dismiss the Complaint on July 26, 2004.  Dkt. 12.  On August 19,

8

2004, Sweeney filed her First Amended Complaint against ManorCare.  Dkt. 14.  ManorCare moved for

9

dismissal of the First Amended Complaint on September 9, 2004 pursuant to Rules 12(b)(6) and 9(b).

10

Dkt. 15.  On October 21, 2004, this Court granted ManorCare's motion in part, denied it in part, and gave

11

Sweeney leave to amend her complaint.  Dkt. 18.  Sweeney amended her Complaint on November 22,

12

2004.  Dkt. 19.  In her Second Amended Complaint, Sweeney's first claim was based on a "Quality of Care

13

Theory" under the FCA, her second claim was based on a theory of "Worthless Services" under the FCA,

14

her third claim was FCA conspiracy, her fourth claim was FCA retaliation, her fifth claim was termination

15

in violation of public policy, and her sixth claim was slander/defamation.  *Id.*  ManorCare and the newly

16

joined Stacey Mesaros then moved to dismiss the first three causes of action pursuant to Rule 12(b)(6)

17

arguing that her FCA "Quality of Care" and "Worthless Services" theories have been rejected in a nursing

18

home setting, and her FCA conspiracy claim should be dismissed as she failed to allege any agreement.

19

Dkt. 21.  On March 4, 2005, Sweeney's FCA "Quality of Care," "Worthless Services," and conspiracy

20

claims were dismissed with prejudice.  Dkt. 28.  Sweeney's motion to amend was denied without

21

prejudice.  *Id.*  On January 6, 2006, Sweeney moved to amend her Second Amended Complaint for the

22

fourth time arguing she should be allowed to proceed on her FCA "Quality of Care" and "Worthless

23

Services" theories.  Dkt. 69.  This motion was denied.  Dkt. 119. Sweeney's remaining claims are as

24

follows: 1) FCA retaliation, 2) wrongful termination in violation of public policy, and 3)

25

slander/defamation.  Dkt. 19.

26

### B.   BASIC FACTS

27

Sweeney worked for ManorCare at its nursing home facility in Gig Harbor, Washington, from

28

February 2001 through January 14, 2003.  Dkt. 134-1, at 1.  Initially she was the Human Resource

1   Manager, but during 2001 also became the Dietary Manager for the facility. *Id.* By February 2002, she
2   was the full time Dietary Manager. *Id.* Sweeney noticed, soon after becoming the Dietary Manager, that
3   certain dietary supplements and snacks, which were prescribed by physicians and clinical dieticians, were
4   not served to the patients. *Id.* at 1-2. Sweeney claims to have repeatedly brought up this issue with
5   various people at ManorCare. *Id.* at 2.

6        Sweeney states that upon becoming the Dietary Manager in February of 2002, she would go to her
7   manager, Stacey Mesaros, and discuss what her "participating role" was regarding the distribution of
8   supplements and snacks. Dkt. 135-7, at 154. She claims she "asked questions about billing, . . . how they
9   are to be removed out of – or off the distribution in the kitchen and when that happens how does it impact
10   costs involved, what [her] relationship would be then to billing, how is it recorded, . . . when they are not
11   given out do we record those so that they are credited if they don't receive them." Dkt. 135-7, at 154-5.
12   She also asked what her "role" was regarding the annual state survey. *Id.* at 155.

13        Mesaros remembers Sweeney began asking questions about the distribution of snacks and
14   supplements approximately "end of summer, early fall, of 2002." Dkt. 112, Ex. B. at 22. Mesaros claims
15   that she first became concerned regarding Sweeney's performance as Dietary Director in June of 2002.
16   Dkt. 112, Ex. B, at 29-30. According to Mesaros, Sweeney failed to properly respond to a computer
17   failure, failed to follow company policy, failed to properly communicate with others, and mistreated her
18   staff. *Id.* at 32-33. Sweeney was placed on administrative leave for two or three days. *Id.* at 33-34.
19   Mesaros indicated that she then became more dissatisfied with Sweeney's performance in December of
20   2002 because Sweeney failed to properly follow company policy regarding keeping temperature logs,
21   reporting, and assuring appropriate sanitation in the kitchen. *Id.* at 35. Specifically, she contends Sweeney
22   did not follow policy regarding a problem with the temperature for the dishwasher's rinse cycle. *Id.* She
23   also states that she had concerns about Sweeney's treatment of her staff and about allegations Sweeney
24   retaliated against her staff for making complaints to the human resources department. *Id.* at 44.

25        Sweeney states that she began an investigation of ManorCare in December of 2002. Dkt. 135-7, at
26   160-1. Sweeney claims it was then that she asked Mesaros, David Duff, the Business Manager, and Mari
27   Kvinsland, the Clinical Dietician, questions regarding billing for snacks and supplements which were not
28   served to the patients. Dkt. 134-1, at 3. Dkt. 135-7 at 158.

1    Sweeney claims that she had a conversation in December of 2002 with Duff.  Dkt. 135-7 at 170.

2    She claims she asked if he received cost reports which included information she put into her computer

3    program regarding snacks and supplements.  *Id.* at 170.  She states he told her that he had nothing to do

4    with her computer program and referred her to Mesaros.  *Id.*  He denied ever knowing Sweeney was

5    pursuing any kind of investigation of Manorcare. Dkt. 112, Ex. C at 60.

6    Sweeney claims that she spoke with Kvinsland in December of 2002 regarding "billing questions

7    and concerns." Dkt. 135-7 at 191.  She did not use the terms "investigate," "fraud," or "whistleblower."

8    *Id.*  She claims she told Kvinsland that she thought that she was being looked at "for bringing nourishments

9    up as a continuous complaint."  *Id.*  Kvinsland denied ever knowing Sweeney was pursuing any kind of

10   investigation of ManorCare.  Dkt. 112, Ex. F at 42, 68-9.

11   On December 28, 2002, Sweeney and Mesaros had a four hour conversation regarding Sweeney's

12   schooling, a report by one of Sweeney's cooks that she had created a hostile work environment, Sweeney's

13   continuing concerns that snacks and supplements prepared by the kitchen were not getting delivered to

14   patients, and Sweeney's role in the up coming state survey. Dkt. 135-7, at 200-5; Dkt. 112, Ex. B, at 103.

15   Sweeney states she told Mesaros she would no longer sign the MDS forms.  *Id.* at 207.  (The form is

16   referred to as the Minimum Data Set ("MDS") and is filled out by an Assessment Coordinator.)  Dkt. 102-

17   2, at 7.  Sweeney additionally claims to have specifically accused Manorcare and Mesaros of "engaging in

18   illegal conduct in regards to billing for service not provided." Dkt. 134-1, at 4.  Mesaros denies that

19   Sweeney ever mentioned that she felt there might be illegal conduct regarding nourishments or snacks.

20   Dkt. 112, Ex. B, at 87.  Mesaros denies Sweeney ever discussed the issue of reimbursement for the

21   nourishments or snacks with her.  *Id.*

22   Mesaros was on vacation from late December 2002 to January 6, 2003.  Dkt. 113, Ex. C at 1.

23   On January 6, 2003, Mesaros claims she asked Sweeney to provide the temperature logs for the freezer,

24   refrigerator, dishwasher and food line.  Dkt. 112, Ex. B at 47.  According to Mesaros, the food service

25   manager was responsible for maintaining temperature logs.  Dkt. 112, Ex. B at 49.  Mesaros stated that

26   under Sweeney, the cooks took the temperatures and filled in the logs.  *Id.*  Mesaros claims Sweeney could

27   not produce the logs.  *Id.*

28   On January 8, 2003 Mesaros received an e-mail from Sweeney saying the temperature logs had

1  been corrected.  Dkt. 135-4, at 9.  Mesaros states the email cause her concern, because she did not know

2  how Sweeney could have "corrected" the logs.  Dkt. 112, Ex. B, at 53.  Mesaros investigated and

3  discovered that for two days a cook, Estella, filled out logs for days that she was not at Manorcare.  *Id.* at

4  55.

5        Estella Kaufholtz stated that Sweeney told her to fill in blanks in the freezer log.  Dkt. 112, Ex. D,

6  at 18.  Kaufholtz stated she knew that it "shouldn't have been done, but that [Sweeney] was the boss."

7  Dkt. 112, Ex. D, at 21.  Sweeney denies that she ordered Kaufholtz to make "entries into the freezer logs

8  after-the-fact."  Dkt. 134-1, at 4.  Sweeney also states that she did not personally falsify the freezer logs.

9  *Id.*

10        Sweeney was terminated on January 14, 2003.  Dkt. 134-1, at 5.  Sweeney claims at the time she

11  had notes and photographs pertaining to her investigation at her desk which she was not allowed to take

12  with her when she left.  Dkt. 134-1, at 5.

13        Sweeney claims to have called the corporate compliance line only once before she was fired in

14  January of 2003, but did not leave any information so that someone could contact her.  Dkt. 135-7 at 176.

15  She states she told them that she "was being targeted" and that she needed to speak with someone

16  "regarding some legal issues."  *Id.* at 177.  ManorCare's corporate compliance line has no record of a call

17  from Sweeney between December 2001 to August 2003.  Dkt. 115, at 3.  Sweeney never contacted

18  ManorCare's legal department about her fraud investigation prior to her termination.  Dkt. 112, Ex. A at

19  175.  Sweeney acknowledges she knew at the time what a whistle blower was, based on her human

20  resources background.  *Id.* at 196.

21        After being terminated from ManorCare, Sweeney applied for unemployment benefits.  Sweeney

22  alleges that Mesaros defamed and slandered her by telling ManorCare employees and the State of

23  Washington Employment Security Department that Sweeney had falsified the temperature logs taken in the

24  kitchen or that she had ordered it done.  Dkt. 112, Ex. A at 276.

25        Sweeney began work for a new company in February or March of 2003, earning $5,000.00 more a

26  year then she did while at ManorCare.  Dkt. 112, Ex. A, at 88 and 115.

27        The record indicates Peggy Dusenbury, Sweeney's replacement, applied for a job at ManorCare

28  upon the suggestion of Jeri Swank.  Dkt. 143 at 2.  Swank, a ManorCare employee, made the suggestion

1    at a party before Christmas in 2002.  *Id.*  Swank states that she did not know of a position, but encouraged

2    people at the party, including Dusenbury, to apply at ManorCare because it employed more than 100

3    people and had openings from time to time.  *Id.*  Mesaros stated that she interviewed Dusenbury the first

4    week of January, sometime after the 6th.  Dkt 112, Ex. B at 68.  Dusenbury does not remember the exact

5    date of her interview, but her application is dated January 7th.  Dkt. 141, at 2.  Mesaros stated she hired

6    Dusenbury the same week Sweeney was fired, although she does not remember the exact date.  Dkt. 112,

7    Ex. B, at 67.  ManorCare's records indicate Dusenbury was hired as the Food Service Director on January

8    15, 2003.  Dkt 140-3 at 2.

9                    **C.    SUMMARY JUDGMENT MOTIONS AND MOTION TO STRIKE**

10           Defendants move for dismissal of Plaintiff's FCA retaliation claim arguing: 1) Plaintiff was not

11   engaged in statutorily protected activity, 2) Defendants had no notice of any protected activity, and 3) she

12   was not terminated because of any protected activity.  Dkt. 116.  Plaintiff responds: 1) she was engaged in

13   protected activity by investigating and collecting information on ManorCare's billing practices for

14   supplements and snacks, 2) she discussed her concerns with Mesaros, Duff, and Kvinsland so ManorCare

15   had notice of her investigation, and 3) the proximity in time between Sweeney's December 28, 2002

16   accusation that ManorCare was engaged in "illegal" conduct and the subsequent hiring of her replacement

17   around a week later provides a strong inference that Sweeney's termination was in retaliation for her

18   activity.  Dkt. 131.

19           Defendants move for dismissal of Plaintiff's termination in violation of public policy claim arguing:

20   1) there is no cognizable Washington public policy at issue, 2) no Washington public policy is  jeopardized

21   by her termination, 3) she was not terminated because of her investigation, and 4) ManorCare was justified

22   in terminating her.  Dkt. 117.  Sweeney responds: 1) Washington has a public policy favoring adequate

23   care for nursing patients, 2) terminating a person investigating improper care and billing jeopardizes the

24   above policy, 3) she was terminated because of her investigation of ManorCare's failure to deliver snacks

25   and supplements and her investigation of their billing practices, and 4) ManorCare's reasons for

26   terminating her were pretextual.  Dkt. 132.

27           Defendants move for summary dismissal of her defamation/slander claim arguing: 1) the alleged

28   defamatory statements are not actionable because they were true or substantially true, opinions, and not

1    published, 2) were privileged, and 3) Sweeney suffered no damages as a result.  Dkt. 111.  Sweeney

2    responds 1) there are issues of fact as to whether the statements regarding the freezer logs are true 2) the

3    statements regarding the freezer logs were made with malice and therefore the privilege does not apply,

4    and 3) the statements were "libelous per se" as they dealt with the practice of her trade or profession and

5    therefore the fact finder is permitted to award substantial damages even in the absence of any proof of

6    actual damages.  Dkt. 130.

7        Defendants move to strike the Declaration of Joan Kaplin, portions of Sweeney's declaration,

8    Plaintiff's contention that Dusenbury was hired January 7, 2003, references to George Deering's notes, and

9    references to Employment Security Department proceedings.  Dkt. 138.

## II.    DISCUSSION

### A.    SUMMARY JUDGMENT STANDARD

12       Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and

13   admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

14   fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56 (c). The moving

15   party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

16   showing on an essential element of a claim in the case on which the nonmoving party has the burden of

17   proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for trial

18   where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party.

19   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must

20   present specific, significant probative evidence, not simply "some metaphysical doubt.").  *See also*

21   Fed.R.Civ.P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence

22   supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the

23   truth.  *Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific*

24   *Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

25       The determination of the existence of a material fact is often a close question.  The court must

26   consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a

27   preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254; *T.W. Elect. Service Inc.*,

28   809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of the nonmoving party

only when the facts specifically attested by that party contradict facts specifically attested by the moving party.  The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*.  Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

## B.      FCA RETALIATION CLAIM

Under the FCA, liability attaches to any person who,

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

31 U.S.C. § 3729(a).  The FCA prohibits an employer from discharging an employee "because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of testimony for, or assistance in an action filed or to be filed under this section." 31 U.S.C. § 3730(h).  "An employee must prove three elements in a § 3730(h) retaliation claim: (1) that the employee engaged in activity protected under the statute; (2) that the employer knew that the employee engaged in protected activity; and (3) that the employer discriminated against the employee because she engaged in protected activity." *Moore v. California Institute of Technology Jet Propulsion Laboratory*, 275 F.3d 838, 845 (9th Cir. 2002) (*citing Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996)).  If the Plaintiff establishes the prima facie case, the burden of production shifts to the employer to prove that the plaintiff would have been terminated even if she had not engaged in the protected activity.  *Karvelas v. Melrose-Wakefield Hospital*, 360 F.3d 220, 235 (1st Cir. 2004) *cert. denied*, 125 S. Ct. 59 (2004); S. Rep. No. 99-345.

### 1.      Sweeney's Protected Activity

In order to be protected by the anti-retaliation provision of the False Claims Act, the plaintiff must be "investigating matters which are calculated, or reasonably could lead, to a viable FCA action." *Moore* at 845.  "[A]n employee engages in protected activity where (1) the employee in good faith believes, and

(2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." *Id.*

There are issues of material fact as to whether Sweeney had a good faith belief that ManorCare was possibly committing fraud against the government. Sweeney provides evidence that, if believed, a reasonable jury could conclude she suspected ManorCare of Medicare/Medicaid fraud. Sweeney states that she began an investigation of ManorCare's billing practices in December of 2002 after repeatedly expressing concerns about the distribution of snacks and supplements. Dkt. 135-7 at 160-1. Sweeney claims she asked Mesaros, Duff, the Business Manager, and Kvinsland, the Clinical Dietician, questions regarding billing for snacks and supplements which were not served to the patients. Dkt. 134-1, at 3. Dkt. 135-7 at 158, 191. In a conversation with Mesaros, Sweeney additionally claims to have specifically accused ManorCare and Mesaros of "engaging in illegal conduct in regards to billing for service not provided." Dkt. 134-1, at 4. As further evidence of her good faith belief in her investigation, Sweeney claims that she had pictures, notes and emails in her desk, but was not allowed to retrieve the day she was fired from ManorCare. Dkt. 112, Ex. A at 161.

Moreover, there are issues of fact as to whether an reasonable employee in the same or similar circumstances might believe that ManorCare was possibly committing fraud against the government. The Dietary Manager for ManorCare, at the time, was not involved in billing. As is evidenced by the multiple motions to amend in this case, the system of Medicare/Medicaid billing is complex. It is not disputed that snacks and supplements were not always being served to the patients. Determination of what a "reasonable employee in the same or similar circumstances might believe" is a fact intensive inquiry, one not appropriately resolved in a Motion for Summary Judgment.

### 2.   ManorCare's Knowledge of Sweeney's Fraud Investigation

"An employee is entitled to whistle blower protection on if the employer is aware that the employee is investigating fraud." *Moore* at 846-7 (*internal quotations omitted*). Sweeney provides evidence from which a reasonable jury could conclude that ManorCare knew she was engaged in the protected activity of investigating fraud. As stated above, Sweeney claims to have discussed her concerns with three ManorCare employees, including accusing Mesaros and ManorCare of "engaging in illegal conduct in regards to billing for service not provided." Dkt. 134-1, at 4. Each of the employees deny

1   these conversations took place.  Issues of fact remain as to whether ManorCare knew Sweeney was

2   investigating fraud.

3           ManorCare argues Sweeney was performing her job duties, not investigating fraud so it would not

4   have notice that she was investigating it.  Dkt. 116, at 21.  However, ManorCare acknowledges that billing

5   the government for snacks and supplements was not a part of Sweeney's job duties.  Her inquiries into

6   billing and accusations of illegal activity regarding billing, if they occurred, could not be reasonably

7   dismissed as performance of her job.  Questions of fact remain on this issue.

8                   3.      Discharge Because of Protected Activity

9           Finally, a plaintiff must show that the employer discriminated against the employee because she

10  engaged in protected activity.  *Moore* at 845.  Legislative history of the FCA states that the employee must

11  show that "the retaliation was motivated at least in part by the employee's engaging in protected activity."

12  *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 518(6th Cir. 2000)(*citing* S. Rep. No.

13  99-345, at 45).

14          Sweeney has raised issues of fact as to whether ManorCare fired her because of her investigation.

15  Sweeney argues that the proximity of time between her December 28, 2002 accusation that ManorCare

16  was engaged in illegal conduct regarding billing, the interviewing and hiring of her replacement (January 7,

17  2003), and her termination (January 14, 2003) indicates ManorCare's termination of her was motivated by

18  her investigation.  The record shows that Sweeney's replacement, Dusenbury, was interviewed on January

19  7, 2003.  Dkt 112, Ex. B at 68.  Sweeney was terminated on January 14, 2003.  Even though the record

20  indicates that Dusenbury was not  hired until January 15, 2003, Dkt 140-3 at 2, the timing of the interview

21  could lead a reasonable jury to conclude that her termination was motivated "at least in part" by her

22  investigation.

23                  4.      Burden Shift to ManorCare to Provide Legitimate Non-Discriminatory Reasons

24          The burden next shifts to ManorCare to provide legitimate non-discriminatory reasons for firing

25  Sweeney.  *Karvelas*, at 235.  ManorCare alleges it fired Sweeney because of poor job performance,

26  including: improperly handling a computer failure, creation of a hostile work environment, failure to submit

27  reports to payroll, failure to follow company procedure regarding dishwasher sanitation, failure to maintain

28  temperature logs, and directing her staff to falsify the temperature logs.  Dkt. 116, at 24.

            Sweeney attacks ManorCare's proffered reasons as pretextual, claiming:  1) all but two of the

reasons were issues before she accused them of illegal billing and they did not fire her, and 2) the issue with freezer logs and retaliation against her staff came up after they had already interviewed her replacement. Dkt. 131, at 13. She argues that the timing regarding her replacement is strong circumstantial evidence of retaliation. Viewing the facts in a light most favorable to Sweeney, a reasonable jury could find that the timing of the interview with Sweeney's replacement creates an inference that the stated reasons for firing her were pretextual. Summary Judgment should not be granted on this issue.

## C.   TERMINATION IN VIOLATION OF PUBLIC POLICY

Washington State recognizes the public policy exception in the following situations: (1) where an employee is fired for refusing to commit an illegal act; (2) where employee is fired for performing a public duty or obligation, such as serving jury duty; (3) where employee is fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employee is fired in retaliation for reporting employer misconduct, *i.e.,* whistleblowing. *Gardner v. Loomis Armored Inc.,* 128 Wn.2d 931, 936 (1996). Here, Sweeney claims to have been fired for being a whistle blower.

To establish a prima facie case for wrongful termination in violation of public policy, a plaintiff must show: 1) the existence of a clear public policy, 2) discouraging the conduct in which they engaged would jeopardize the public policy, 3) the public-policy-linked conduct caused the dismissal, and 4) the defendant must not be able to offer an overriding justification for the dismissal. *Gardner* at 941.

### 1.   Existence of Clear Washington Public Policy

Washington has a clear public policy regarding the proper billing of Medicaid services. Plaintiff does not identify a clear state public policy which was violated when she was terminated. She makes reference to the "extensive State statutes and regulations pertaining to delivery of Medicaid services to patients. (See: RCW 74.45, et seq; and W.A.C. 388-96 et seq.)" Dkt. 132, at 2. However, the Washington State Medicaid payment system statute, RCW 74.46, is concerned with cost reimbursement. *Seatima Convalescent Center v. DSHS*, 82 Wn. App. 495, 503 (1996). Under this statute, Washington State has a clear public policy: proper Medicaid billing. Moreover, Washington state has a public policy interest in the provision of adequate nourishment for nursing home patients.

### 2.   Policy Jeopardy

Sweeney must next show that discouraging the conduct in which she engaged would jeopardize the public policy. *Gardner* at 941. There are issues of fact as to whether Plaintiff engaged in a fraud

ORDER
Page - 11

investigation of ManorCare, as discussed above.  If a trier of fact finds that she was engaged in a fraud investigation of ManorCare, then clearly the state's public policy of proper Medicaid billing would be in jeopardy if employees of nursing homes were discouraged from investigating perceived fraud.

### 3.   Causation of Dismissal and Justification of Dismissal

The third element Sweeney must show is that the public-policy-linked conduct caused the dismissal. *Gardner* at 941.   As above, Sweeney raises issues of fact as to whether her fraud investigation caused her dismissal.  Lastly, defendant must not be able to offer an overriding justification for the dismissal.  *Gardner* at 941.  As above, although ManorCare has offered several justifications for her dismissal, if the facts are viewed in a light most favorable to Sweeney, she has alleged sufficient issues of fact to avoid summary judgment.  Summary Judgment should not be granted as to this issue.

## D.   SLANDER AND DEFAMATION CLAIM

Defamation is the unprivileged communication of a false fact about a living person to another which causes damage to the person. *Herron v. King Broadcasting Co.*, 112 Wn.2d 762 (1989).  "In Washington, a defamation plaintiff must show four essential elements: falsity, an unprivileged communication, fault, and damages." *Commodore v. Univ. Mech. Contractors, Inc.,* 120 Wn.2d 120, 133 (1992).  In order to defeat a summary judgment, a plaintiff must raise a genuine issue of material fact on all four elements of the claim. *LaMon v. Butler,* 112 Wn.2d 193, 197 (1989).

Sweeney does not clearly point to which statements she alleges were slanderous or defamatory.  Based upon her Response, Sweeney appears to be arguing that Mesaros published "defamatory statements to those in the ManorCare facility" regarding her falsification of the freezer logs or her order that Kaufholtz falsify them.  Dkt. 130, at 3-4.  She alleges ManorCare defamed her when it contested her unemployment benefits on the ground that she falsified the freezer logs.  *Id.*

### 1.   Falsity

A plaintiff must show that the statements were in fact false in order to avoid summary judgment. *Eubanks v. North Cascades Broadcasting*, 115 Wn.App. 113, 120 92003).  Sweeney contends that she did not personally falsify the freezer logs, nor did she order anyone else to falsify the logs.  Dkt. 134-1, at 4. Kaufholtz testified that Sweeney ordered her to falsify the logs.  Dkt. 112, Ex. D, at 18.  Sweeney has shown that there are issues of fact as to whether she ordered Kaufholtz to falsify the logs, therefore there are issues of fact as to whether the statement is true.  Sweeney argues that whether she falsified the freezer

1   logs has already been adjudicated by the State of Washington and so ManorCare is bound by that

2   determination.  Her argument is misplaced.  RCW 50.32.097 provides that use of findings by a Washington

3   Security Employment administrative law judge are not conclusive, binding, "nor admissible as evidence in

4   any separate action . . . between an individual and the individual's present or prior employer before . . . a

5   judge of . . . the United States, regardless of whether the prior action was between the same or related

6   parties or involved the same facts. . . ."  Whether Sweeney did, in fact, alter the logs herself, or order Ms.

7   Kaufholtz to do so remains an issue of fact.

8                          2.        Unprivileged Communication

9          In Washington, communications within a corporation are not "published" for the purposes of

10  defamation.  *Prins v. Holland-North Am. Mortgage Co.*, 107 Wn.2d 206, 208 (1919).  Furthermore,

11  Courts in Washington acknowledge a specific qualified privilege for communications by an employer

12  evaluating the performance of its employees.  *Doe v. Gonzaga Univ.*, 143 Wn.2d 687 (2001).  A

13  publication solely related to a plaintiff's employment and his/her work performance is privileged.  *Id.*  "A

14  privileged communication involves the occasion where an otherwise slanderous statement is shared with a

15  third person who has a common interest in the subject and is reasonably entitled to know the information."

16  *Id.* at 702.  If as a matter of law the court decides a privilege applies, the burden shifts to the plaintiff to

17  show that the defendant abused the privilege.  *GEM Trading Co., Inc. v. Cudahy Corp.,* 22 Wn.App. 278,

18  282 (1978).

19         Statements that Mesaros made to other employees at ManorCare were privileged communications.

20  The evidence in the record indicates that the individuals to whom Mesaros made the statements were

21  reasonably entitled to know the basis upon which Sweeney was fired.  Comments about Sweeney's work

22  performance were made "in the ordinary course" of Mesaros's work as Sweeney's supervisor.

23         Moreover, statements ManorCare (or its agent) made to the Washington State Security

24  Employment office were privileged communications.  The statements were related to Sweeney's

25  employment and her work performance.  The fact that the ALJ found that no misconduct had occurred is

26  not relevant to this issue because ManorCare did not contest Sweeney's appeal and RCW 50.32.097

27  specifically forbids use of the findings as conclusive in this action.

28         Sweeney argues that Mesaros and ManorCare lost the privilege when they acted out of malice.

    Dkt. 130, at 11.  When a defendant has a qualified privilege to communicate a potentially defamatory

statement, the privilege may be lost by showing actual malice.  *Doe* at 703 (*citing Caruso v. Local Union No. 690*, 107 Wn.2d 524, 530-31 (1987)).

> Actual malice exists when a statement is made with knowledge of its falsity or with reckless disregard of its truth or falsity.  To prove actual malice a party must establish that the speaker knew the statement was false, or acted with a high degree of awareness of its probable falsity, or in fact entertained serious doubts as to the statement's truth.

*Id.* (*quoting  Herron v. KING Broad. Co.*, 109 Wash.2d 514, 523, 746 P.2d 295 (1987) and *Story v. Shelter Bay Co.*, 52 Wash.App. 334, 343, 760 P.2d 368 (1988)).

Based upon the evidence in the record, Sweeney failed to establish malice.  Sweeney points to no evidence that Mesaros "knew the statement was false, or acted with a high degree of awareness of its probable falsity, or in fact entertained serious doubts as to the statement's truth." *Doe* at 703.  Moreover, at the time of the event, the record indicates the opposite.  On January 6, 2003, Mesaros claims she asked Sweeney to provide the temperature logs for the freezer, refrigerator, dishwasher and food line.  Dkt. 112, Ex. B at 47.  Sweeney could not produce the logs.  *Id* at 49.  On January 8, 2003, Mesaros received an e-mail from Sweeney saying the temperature logs had been "corrected."  Dkt. 135-4, at 9.  The email caused Mesaros concern, because she did not know how Sweeney could have "corrected" the logs.  Dkt. 112, Ex. B, at 53.  Mesaros investigated and discovered that for two days a cook, Estella Kaufholtz, filled out logs for days that she was not at ManorCare.  *Id.* at 55.  Kaufholtz stated that Sweeney told her to fill in blanks in the freezer log.  Dkt. 112, Ex. D, at 18.

Sweeney argues the timing of her replacement's interview and hiring is evidence that the statements that she either falsified the logs or ordered Kaufholtz to do so were made with malice.  Sweeney's argument fails.  No reasonable jury could find such a connection given the evidence in the record.  Summary Judgment should be granted on Sweeney's defamation/slander claim and the claim should be dismissed with prejudice.

### E.    RELATED MOTION

Defendants move to strike the Declaration of Joan Kaplin, portions of Sweeney's declaration, Plaintiff's contention that Dusenbury was hired January 7, 2003, references to George Deering's notes, and references to Employment Security Department proceedings.  Dkt. 138.

Defendant's motion to strike regarding Joan Kaplin's declaration should be granted.  Portions of Joan Kaplin's declaration which include references to statements of Mary Jo Morrissey and George

1  Deering should be stricken as hearsay as they related to out-of-court statements by other parties offered for
2  the truth of the matters asserted.

3  Defendant's motion to strike portions of Sweeney's declaration where it contradicts her sworn
4  deposition testimony should be granted as to testimony regarding Duff.  Although Sweeney states that she
5  discussed billing questions withe Duff in her declaration, her sworn testimony indicates they discussed his
6  access to her computer program.  Dkt. 135-7 at 170.

7  Defendant's motion to strike Sweeney's references to Dusenbury's hire date as January 7, 2003
8  should be granted.  The record indicates that Dusenbury was hired on January 15, 2003.  Dkt 140-3 at 2.

9  Defendant's motion to strike reference to the findings of the ALJ in the unemployment proceeding
10  should be granted in accordance with RCW 50.32.097, as above.

11  **III.   <u>ORDER</u>**

12  Therefore, it is hereby **ORDERED** that:

13  • Defendants' Motion for Partial Summary Judgment on Federal Claims Act Retaliation Claim (Dkt.
14  116) is **DENIED**,

15  • Defendants' Motion for Partial Summary Judgment of Dismissal of Plaintiff's Wrongful
16  Termination in Violation of Pubic Policy Claim (Dkt. 117) is **DENIED**,

17  • Defendants' Motion for Partial Summary Judgment of Dismissal of Plaintiff's Defamation/Slander
18  Claim (Dkt. 111) is **GRANTED**, this claim is **DISMISSED WITH PREJUDICE**, and

19  • Defendants' Motion to Strike Inadmissible Evidence and Argument Based thereon from Plaintiff's
20  Oppositions to Defendants' Motions for Summary Judgment (Dkt. 138) is **GRANTED**.

21  The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any
22  party appearing *pro se* at said party's last known address.

23  DATED this 5th day of April, 2006.

24

25  Robert J. Bryan
26  United States District Judge

27

28